**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SHAUN R,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 18 C 4036** |
| | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **ANDREW SAUL, Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## AMENDED MEMORANDUM OPINION AND ORDER

Plaintiff applied for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act ("Act"), 42 U.S.C. §§ 1381a, 1382c, over four years ago. (Administrative Record (R.)

210-215). He claimed that he became disabled as of February 18, 2014, due to bipolar disorder,

depression, anxiety, and a learning disability. (R. 210, 243). Over the ensuing three years, plaintiff's

application was denied at every level of administrative review: initial, reconsideration, administrative

law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review.

See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g), and the parties

consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636( c) on August 16,

2018. [Dkt. #8]. The case was reassigned to me on January 10, 2019. [Dkt. # 22]. Plaintiff asks the

court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order

affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the
Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and
the first initial of their last name.

# I.

Plaintiff was born on October 16, 1980 (R. 192), and was just 29 years old when he claims he became unable to ever work again. (R. 210). He has a spotty work record, at best, having had five jobs in his adult life, and never one for more than a month or two. (R. 245). Most recently, he worked in retail sales for a wireless company from October 2103 to February 2014. (R. 245). He didn't get along with his boss, had an argument with him, and was let go. (R. 243). Child support orders in the record indicate that, while he was not working from 2004 through 2006, he fathered three children by three different women. (R. 196-208). He reported to one of his mental healthcare providers it was seven children with five different women. (R. 446). He currently lives with his mother and his finance. (R. 43). His fiancé drives him around because his license was suspended for not paying child support. (R. 45). He spends his days watching televison and doing his hobbies – working on cars, doing puzzles, and drawing – which he says he handles very well. (R. 266). He goes out a couple of times a week, perhaps to a movie. He also goes to the gym and the park every couple of days. (R. 266).

After an administrative hearing – at which plaintiff, represented by counsel, and a vocational expert testified – the ALJ determined plaintiff was not disabled. The ALJ found that plaintiff had the severe impairment of major depressive disorder/bipolar disorder. (R. 17). Plaintiff was also obese, but it was not severe as it caused no more than minimal limitations to plaintiff's ability to perform basic work activities. (R. 18). The ALJ went on to determine that plaintiff's psychological impairment caused a mild limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and no limitation in adapting or managing himself. (R. 20-21). But, because not

one area was affected to a marked level, the ALJ found that plaintiff's psychological impairments, either singly or in combination, did not meet or equal a listed impairment assumed to be disabling in the Commissioner's listings. (R. 21).

The ALJ then stated that the plaintiff had the residual functional capacity to perform work at all exertional levels with the following nonexertional limitations due to his psychological impairment: "lacks the ability to understand, remember, and carry out detailed instructions because of the moderate limitations in concentration, but retains the concentration necessary for simple work of a routine type if given normal workplace breaks . . . Would be unable to maintain assembly line or production pace employment because of moderate limitations in pace, but maintains the ability to perform work permitting a more flexible pace; because of moderate difficulties interacting with others, may only engage in brief and superficial contact with supervisors, co-workers, and the general public; can work in proximity to others but should not work on joint or shared tasks." (R. 21). The ALJ next found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for reasons explained in this decision." (R. 22). In this regard the ALJ felt that medical evidence, course of treatment, medications and overall functioning did not support the plaintiff's alleged disabling symptoms. (R. 22).

The ALJ then summarized the record of plaintiff's sessions with his doctors and therapists, noting that treatment was conservative and relatively limited. (R. 23-24). Also, she found that plaintiff's daily activities are not as limited as one would expect given the degree of limitations he alleged. (R. 24). The ALJ also assessed the medical opinion evidence. The psychiatrist who

examined plaintiff in connection with his application noted that while plaintiff had a number of complaints regarding depression and anxiety, he did not present that way, and the doctor questioned his reliability. (R. 26). The ALJ gave great weight to this opinion, finding it consistent with the medical evidence overall. (R. 26). The ALJ accorded record could communicate with co-workers and supervisors, follow and retain most instructions, perform simple, routine tasks, but would have difficulty handling moderate work stress. The ALJ did not find the opinion of the psychiatrist who saw plaintiff on four occasions in 2014-15 that plaintiff was disabled entitled to great weight because it was not supported by the treatment notes and disability was a determination reserved for the Commissioner. (R. 26). The ALJ also found the opinion of plaintiff's therapist entitled to limited weight as it was based on an uncritical acceptance of plaintiff's subjective reports, and was not from an acceptable medical source. (R. 27). The ALJ gave great weight to the opinions of the state agency reviewing physicians as they are familiar with the criteria for entitlement to SSI and their opinions were consistent with the medical record. (R. 27).

Next, the ALJ determined that plaintiff could not return to his past work in sales because it was skilled work and obviously required more contact with the public than the ALJ's residual functional capacity finding allowed. (R. 27). The ALJ then relied on the testimony of the vocational expert and found that given his residual functional capacity, plaintiff could perform the following jobs that exist in significant numbers in the national economy: laundry laborer (DOT #361.687-018; 110,000 jobs nationally), kitchen helper (DOT #318.687-010; 278,000 jobs nationally), and automotive detailer (DOT #915.687-034; 76,000). (R. 28). Accordingly, the ALJ concluded that plaintiff was not disabled and was not entitled to benefits under the Act. (R. 28-29).

**II.**

If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). *See Smith v. Berryhill*, _U.S._, 139 S.Ct. 1765, n.19 (2019). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). *Accord Biestek v. Berryhill*, _U.S._, 139 S.Ct. 1148, 1152 (2019). To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017)

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact

do not build an accurate and logical bridge between the evidence and the result."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record, . . . ."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties, . . . No matter, because we may affirm on any basis that appears in the record.").

At the same time, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985); *see also Mogg v. Barnhart*, 199 F. App'x 572, 576 (7th Cir. 2006); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).

## III.

### A.

As is generally the case with plaintiffs claiming disability based on psychological issues like depression or anxiety, page after page of therapists' notes show that plaintiff is sometimes depressed, sometimes better, sometimes fine. Invariably, a plaintiff will recount issues with family, spouses, or significant others, and plaintiff here is no different. There's not much in records like these to suggest whether a plaintiff can work or cannot. So, these are always difficult cases for an ALJ to sift through. And, this one, is made more difficult due to the variances in the tales the plaintiff has told

the ALJ and his mental healthcare providers.

In his brief, plaintiff states that he spends three weeks at a time in bed, or that for 75% of the time, he is so depressed he cannot get out of bed. [Dkt.#13, at 2, 11]. Yet, there is only a single reference to anything like this in the therapy notes. However, when plaintiff told Dr. Fatyga that he spent three weeks in bed in September 2015 and attempted suicide by pills. (R. 425). But records contemporaneous to September 2015 [2] make no reference to any such episode. On September 3rd, plaintiff was assessed as stable, generally calm, and his main issue was with his mother not liking their new puppy. (R. 438). He denied any suicidal ideas. (R. 346, 347). On September 30th, at a physical exam, plaintiff was in no distress, displayed normal mood, affect, and behavior. (R. 433). On October 7th, therapist notes indicate he was upset about back child support and said he was hearing voices. (R. 430). It was noted that he was not compliant with his medication. (R. 430).

On another occasion, on May 2, 2016, he told his therapist he had attempted suicide and was hospitalized two months earlier. (R. 590). But there is no indication of any hospitalization in the record – and plaintiff certainly doesn't point to any in his brief or stipulated facts – and notes from treatment session during that time make no mention of anything like that. (R. 550, 551, 553). Indeed, on March of 2016, plaintiff was assessed as no risk of harm to himself and no indications of suicidal ideation. (R. 551).

In July of 2016, the story was different. At that time, plaintiff told another mental healthcare provider that his only suicide attempt occurred five years earlier, in 2011. (R. 532). There was no mention of the more recent 2015 or 2016 attempts, and no mention of any hospitalization, recent or

---

[2] Just prior to September 2015, plaintiff was vacationing in Puerto Rico. Before leaving on his trip, he was happy and looking forward to it (R. 352), but he didn't bring his medication with him and was depressed the entire time. (R. 46). Again, there is no mention of any suicide attempt.

remote.  (R. 532).

Also, the record is rather confusing regarding whether plaintiff even has bipolar disorder or if he does, when he was diagnosed.  In July 2014, plaintiff told his psychologist that he thought he had bipolar disorder, although he had never been diagnosed.  (R. 354).  In January 2015, the consultative psychiatrist said that plaintiff did not present as having anxiety, was not in depression at the time, and was an unreliable historian.  (R. 367).  Oddly, in February of 2015, the psychiatrist from Presence Health – possibly Dr. Piyaka[3] – stated that plaintiff had "longstanding history of bipolar disorder."  (R. 374).  Yet, the first mention of it from any mental healthcare provider comes from this same psychiatrist just a couple of months earlier.  (R. 384).  By October 2016, the diagnosis from another Presence Health was not bipolar disorder, but major depressive disorder, mild.  (R. 384).

## B.

These are just a handful of examples to give the gist of the record the ALJ had to wrestle with.  From this perspective, the ALJ certainly did yeoman's work in wading through a jumble of competing entries from mental healthcare providers and changing stories from the plaintiff.  But from the plaintiff's perspective, the ALJ bungled it.   The plaintiff argues that the ALJ made four reversible errors: the ALJ's step three finding was based on a deeply flawed assessment of the Listing of Impairments' "B" criteria; she failed to accommodate all plaintiff's non-exertional limitations in her RFC finding; she found that plaintiff's allegations were not supported by the evidence, or based on any analysis; and her assessment of qualified medical opinion is unexplained.

---

[3] The plaintiff and the ALJ refer to this doctor as Song Piyaka, although the request for records was directed to a Dr. Hadairi Shikari.  (R. 371).  The treatment notes are stamped with Dr. Piyaka's name (R.378-82); the  report is signed, but the signature is illegible.  (R. 377).

Beyond this, plaintiff's brief takes a blunderbuss approach, giving one the impression that it is throwing as many things at the wall as possible in the hopes that something will stick. That mode of presentation, which is all too frequent, is unhelpful and has consistently been condemned. *See, e.g., United States v. Stokes*, 726 F.3d 880, 887 (7th Cir. 2013) (criticizing the scattershot approach to brief-writing); *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 513 (7th Cir. 2011) ("[T]he 'kitchen sink' approach to briefing cause[s] distraction and confusion, it also consumes space that should be devoted to developing the arguments with some promise."); *U.S. v. Brocksmith* 991 F.2d 1363, 1366 (7th Cir. 1993)("A client is disserved when the most meritorious arguments are drowned in a sea of words."); *Fifth Third Mortg. Co. v. Chi. Title Ins. Co.*, 692 F.3d 507, 509 (6th Cir. 2012) ("When a party comes to us with nine grounds for reversing the [lower court's decision], that usually means there are none."); *United States v. Mahoney*, 247 F.3d 279, 282 (D.C. Cir. 2001). *See also* Matthew Kennelly, *Over-Arguing Your Case*, 40 LITIGATION 41 (Winter 2014). Arguments are raised and left behind in two or three sentences, with many unsupported by caselaw and scarcely developed. *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir.2017) ("We have repeatedly and consistently held that 'perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.' " (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991))). Some arguments are, as will be seen, based on a misreading of the ALJ's opinion, and, in the end, the opinion is entitled to be affirmed.

## C.

We begin with the plaintiff's criticisms of the ALJ's findings regarding the "B" psychological criteria. The argument seems to be based on a misreading of the record and the ALJ's decision. For example, plaintiff complains that the ALJ, in assessing plaintiff's "understanding, remembering, or applying information" as mildly limited, focused on benign findings and inexplicably said she was resolving conflicts in the evidence without indicating what those conflicts were. [Dkt. # 13, at 8]. As the plaintiff, himself, indicates, there are positive signs and negative signs regarding plaintiff's capabilities in this area; these were conflicts that the ALJ had to resolve. Moreover, as is clear from the ALJ's discussion, she did not base her finding exclusively on the fact that plaintiff "can remember his birthday or recall three digits out of five." [Dkt. #13, at 8]. The ALJ also noted that plaintiff spends time researching various topics, working on cars, and during an examination was able to recall topical news items, three or four words immediately and after five minutes, and the last three presidents. (R. 19). This, based on the plaintiff's brief and the parties' stipulated statement of facts, appears to be the only assessment of the plaintiff's memory anywhere in the record. Plaintiff's treating psychiatrist, for example, indicated he never assessed plaintiff's memory. (R. 375). If there are assessments showing plaintiff's memory is more limited than the ALJ found, it was up to the plaintiff to point those out to the court. *See, e.g., Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 731 (7th Cir. 2014)(lawyers cannot expect judges to play archaeologist with the record); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Illinois*, 908 F.3d 290, 297 (7th Cir. 2018)*(*"As has become 'axiomatic' in our Circuit, '[j]udges are not like pigs, hunting for truffles buried in' the record.'"); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 537 (7th Cir. 1992)(". . . compelling the court to take up a burdensome and fruitless scavenger hunt . . . is a drain on its time and resources."). That has not occurred.

The plaintiff has similar issues with the ALJ's assessment of his ability to interact with others, which the ALJ found was moderately limited. In discussing the evidence and plaintiff's testimony, the ALJ noted that the plaintiff said he went to movies with his fiancé and children, went to the gym with a friend, and had no problem getting along with family, friends, or neighbors. On the other hand, the ALJ noted the plaintiff claimed he could not get along with co-workers or supervisors. (R. 20). So, again, the ALJ had to weigh the evidence – mostly plaintiff's testimony – and arrive at a finding. "Weighing conflicting evidence . . . is exactly what the ALJ is required to do." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004); *see also Lafayette v. Berryhill*, 743 F. App'x 697, 699 (7th Cir. 2018). Then the ALJ accommodated plaintiff's moderate limitation in this area by limiting plaintiff to only brief, superficial contact with co-workers and supervisors. (R. 21). What more the ALJ should have done is left unexplained in plaintiff's brief. "We cannot ...substitute our judgment for the ALJ 's when considering the weight of the evidence, and [the plaintiff] must do more than point to a different conclusion that the ALJ could have reached to demonstrate that the credibility determination was patently wrong." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

Plaintiff continues in this vein in regard to the ALJ's findings that he is moderately limited in his ability to concentrate and is not restricted in his ability to manage himself. In each discussion, the ALJ noted examples of plaintiff's allegations – positive and negative and, in the case of concentration, the only instance where concentration was assessed in examination. (R. 20-21). So, as she is required to do, the ALJ acknowledged evidence on both sides of the issue and reached a conclusion. As long as she didn't ignore evidence that points to a disability, she has fulfilled her duty to minimally articulate the path to her conclusion. *See Johnson v. Berryhill*, 758 Fed.Appx. 543, 545 (7th Cir. 2019)("While an ALJ, of course, may not ignore an entire line of evidence

contrary to his conclusion, . . . he need not mention each piece of evidence."); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)(ALJ need only ""articulate at some minimal level his analysis of the evidence, . . . ."); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir.2004)("An ALJ must only "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability.").

Along those lines, the plaintiff next accuses the ALJ of having ignored "both objective and subjective evidence of marked deficits in all of the functional areas." [Dkt. # 13, at 9]. It is surprising that plaintiff thinks there is objective evidence of marked limitations as psychiatric evidence is necessarily subjective. That is because there is no objective testing for impairments like depression or bipolar disorder. *See, e.g., Knapp v. Berryhill*, 741 F. App'x 324, 328 (7th Cir. 2018); *Aurand v. Colvin*, 654 F. App'x 831, 837 (7th Cir. 2016); *Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015). Significantly, the only evidence the plaintiff cites are his own *subjective* allegations that he left all his jobs because – he said – he couldn't get along with bosses or coworkers, and his similar claims to mental healthcare providers. [Dkt. #13, at 10-11].

Plaintiff's psychiatrist has never observed plaintiff having "serious limitations in completing household duties." [Dkt. # 13, at 10], (R.374). The claim is a function of whether the plaintiff was truthful with the doctor. Ultimately then, it does not hinge on the doctor's capabilities or credibility, but on the credibility of the plaintiff. Similarly, a student intern never assessed plaintiff's concentration (R, 487-524) before opining it was markedly limited. [Dkt. # 13, at 10], (R.374). That came from the plaintiff's lips. The student intern was quite clear that his finding that the plaintiff was markedly limited was based on the plaintiff telling him he did not like meeting new people. (R. 415). Plaintiff's psychologist calls the PHQ9 results "objective" (R. 395, 399), but this is merely a self-administered test that a patient fills out to recount his claimed symptoms over the previous two

weeks. The clinician then adds up the totals of the plaintiff's entries and enters it. It may be a useful tool for psychologists, (assuming that it is truthful) but it's the very definition of subjective evidence, whatever the psychologist may call it. In short, none of the supposedly objective evidence plaintiff touts is objective. "Abraham Lincoln once was asked how many legs a donkey has if you call its tail a leg. His answer was four: calling a tail a leg does not make it one . . . ." *Blue Cross Blue Shield of Massachusetts, Inc. v. BCS Ins. Co.*, 671 F.3d 635, 638 (7th Cir. 2011). And calling the subjection answers of a person objective does not automatically mean the statements are true or accurate.

### D.

So all this "objective" supposedly evidence is necessarily subjective. The subjective evidence is not irrelevant, of course and, importantly(and contrary to the plaintiff's brief), the ALJ didn't ignore it. Quite the contrary. She summarized and discussed each of these opinions from plaintiff's mental health care providers. (R. 26-27). That she did not merely accept them uncritically as the plaintiff would have liked, does not mean she did anything wrong. The ALJ explained the weight she gave – or didn't give – each of these opinions. Again, this is what it means to build an accurate and logical bridge and is what we ask of an ALJ. The plaintiff's argument, if uncritically accepted, would mean the plaintiff would always win, under circumstances like those presented here. The ALJ's role would be vastly different than it is.

We note that the plaintiff faults the ALJ for giving "less weight" to Dr. Piyaka's Opinion because it was inconsistent with his own treatment notes. (R. 25). But, that is a common sense and often applied reason for discounting a treating source's opinion. *Burmester v. Berryhill*, 920 F.3d 507, 512 (7th Cir. 2019); *Winsted v. Berryhill*, 915 F.3d 466, 472 (7th Cir. 2019). Plaintiff obviously disagrees and thinks that Dr. Piyaka's treatment notes support his dire assessment of the plaintiff's

capabilities, but does not explain how. Unfortunately, saying so doesn't make it so. *Gaston v. Ghosh,* 498 F.3d 629 (7th Cir 2019); *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010).

Dr. Piyaka saw plaintiff five times prior to issuing his opinion. (R. 378-82). His treatment notes – as the plaintiff has to concede [Dkt. #13, at 5] – are mostly illegible, but it appears mental status exams, while somewhat cursory were normal. They state, for example, that plaintiff was "alert and oriented", "no delusions", etc. (R. 372-82). Of course, this is not to say that the baseline for a full capacity to sustain work is not suffering delusions, but it is to say that these notes do not support the doctor's dire, ultimate opinion – or at least the ALJ could reasonably and properly conclude that they did not.

Notably, through 15 pages of briefing and a 15-page stipulated statement of facts, plaintiff only specifically references one treatment note from Dr. Piyaka: "On March 27, 2015, Dr. Piyaka increased plaintiff's dosage of Seroquel, and noted a diagnosis of bipolar disorder." [Dkt. # 13, at 4; #25, at 10]. Beyond that, plaintiff also says that Dr. Piyaka saw plaintiff every four weeks in 2016, and noted a diagnosis of bipolar disorder and adjusted medications. [Dkt. # 13, at 5; #25, at 13]. But diagnosis is not disability. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005); *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998); *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)("The issue in the case is not the existence of these various conditions of hers but their severity and, concretely, whether, as she testified . . . they have caused her such severe pain that she cannot work full time."). Without more, it is a leap of faith to go from these cryptic entries to something like Dr. Piyaka's "[plaintiff's] definitely severely disabled . . . ." (R. 377). The plaintiff doesn't explain how the ALJ was to make of such records, but she was not required to accept Dr.

Piyaka's opinion without any support.

Plaintiff next complains about the ALJ rejecting the opinion from the student intern, Mr, Moorehead, that plaintiff was markedly limited in multiple areas. The ALJ said this opinion was based too uncritically on plaintiff's subjective reports and did not come from an acceptable medical source. Again, these are both entirely valid reasons for according lesser or no weight to the opinion. *See, e.g, Winsted v. Berryhill*, 915 F.3d 466, 472–73 (7th Cir. 2019)(ALJ properly rejected opinion from psychologist as it "largely reflected [plaintiff's] subjective reporting.")*; Thomas v. Colvin*, 826 F.3d 953, 959 (7th Cir. 2016); *Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016).

In this regard, it must be noted that the Seventh Circuit has called ALJs on the carpet for dismissing opinions from psychologists and psychiatrists because they were based on a patient's subjective reporting. As noted earlier, "[b]y necessity . . . patients' self-reports often form the basis for psychological assessments." *Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015). But, while a psychiatrist or psychologist may have the ability to parse a patients' exaggerations and fabrications from real "complaints through the objective lens of . . . professional expertise" *Mischler v. Berryhill*, 766 Fed.Appx. 369, 375 (7th Cir. 2019), a student does not, or at least is not automatically assumed to have the same capabilities in this regard as a practicing psychologist or psychiatrist. And, while in many cases there is no basis in the record for disbelieving a patient's accounts to a mental healthcare provider,[4] there are bases here. We have already recounted the exaggerations or fabrications in plaintiff's statements to his mental healthcare providers, and the consultative psychologist who examined plaintiff felt he was an unreliable source of symptoms and limitations.

----

[4] *Cf. Adaire v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015)("That was no basis for disbelieving that he experiences panic attacks. He said he did, the psychologist and the therapist believed him, and the administrative law judge had no basis for disbelieving them.").

Not surprisingly, the plaintiff has an issue with the ALJ according "great weight" to the consulting psychiatrist's opinion. The ALJ said Dr. Raval was an expert in disability determinations and that the examination was consistent with treatment notes and the overall evidence. (R. 26). The plaintiff says he does not know why Dr. Raval questioned his credibility. [Dkt. # 13, at 14]. The answer is rather simple. The plaintiff told the doctor he had a lot of anxiety and was upset, angry, and sad. (R. 365-66). But the doctor, through *his* lens of professional expertise found he didn't present that way and didn't believe him. *See Adaire*, 778 F.3d at 688.

## E.

Some additional points must be addressed. The plaintiff argues that ALJ failed to address the "B" criteria later in her opinion when she was arriving at her residual functional capacity finding. [Dkt. #13, at 11]. It's unclear what plaintiff is driving at here or why the ALJ needed to revisit the same finding twice in her opinion. In any event, the ALJ's findings – a mild limitation in processing information and moderate limitations in concentrating and social interaction – were accounted for in her residual functional capacity finding, rather explicitly. (R. 21). Nowhere in the ALJ's opinion did she jump from the failure to meet a listed impairment to plaintiff being not disabled, contrary to plaintiff's reading of the ALJ's opinion. Instead, the ALJ made the limitations supported by the record part of her hypothetical to the vocational expert and then relied on the vocational expert's testimony. *See Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987) ("All that is required is that the hypothetical question [to the VE] be supported by the medical evidence in the record."); *Murphy v. Colvin*, 759 F.3d 811, 820 (7th Cir. 2014)("The ALJ is only required to incorporate into her hypotheticals those impairments and limitations that she accepts as credible."). The ALJ did not accept the marked limitation the student extern thought plaintiff had and, as has been discussed,

adequately explained why.

The plaintiff also complains that the ALJ failed to account for his deficiencies in concentration, citing *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015). [Dkt. # 13, at 11]. But that argument either misreads *Varga* or the ALJ's decision. The ALJ did not merely limit plaintiff "to simple, routine tasks and limited interactions with others." *Cf. Varga*, 794 F.3d at 814. The ALJ added restrictions against assembly line or production work and limited plaintiff to jobs with a flexible pace. (R. 21). Unlike a broad restriction to simple work, it should be easy to see how such limitations account for one whose concentration might wax and wane. *Cf. Joanne F. v. Berryhill*, 2019 WL 1388962, at *4 (N.D. Ill. 2019).

Finally, the plaintiff argues that the ALJ's assessment of his allegations about his limitations violates SSR 16-3p. [Dkt. # 13, at 12]. The plaintiff doesn't cite anything from the ruling, but is concerned about the ALJ's references to course of treatment, daily activities, the medical record, and improvement from medication. The plaintiff begins by stating that the ALJ's reference to conservative treatment reveals a misundertstanding of mental illness. But, clear as day, the very ruling the plaintiff claims the ALJ violated requires ALJ to consider course of treatment, including frequency, extent, and compliance. SSR 16-3p, 2017 WL 5180304, *9. Here, the record shows that treatment was therapy and medication, which is fairly routine, and that many of plaintiff's problems occurred when he stopped following his medication regimen.

Contrary to the plaintiff's misreading of the ALJ's opinion, the ALJ never said that the treatment or noncompliance was evidence that plaintiff could work; she said is was a reason to disbelieve plaintiff was suffering the crippling symptoms he claimed he was. (R. 24). Plaintiff's citation to *Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015), where the ALJ said that fact that the

plaintiff was never institutionalized undermined his allegations and the court explained that such a resort was reserved for the suicidal, has nothing to do with what the ALJ did here. If anything, it serves as a tacit admission that plaintiff was lying about having been hospitalized due to a suicide attempt.

Similarly, plaintiff argues that his daily activities do not translate to an ability to work on a full-time basis. [Dkt. #13, at 12-13]. True, but this is yet another misreading of the ALJ's opinion. What the ALJ said was "the claimant has described daily activities . . . that are not as limited to the extent that one would expect, given the complaints of disabling symptoms and limitations. Spending weeks at a time in bed, or 75% of one's time in bed, for example, doesn't jibe with working on cars, doing household chores a couple of hours each week, going outside for walks 2-3 times a week, going to movies or out to eat twice a week, etc. (R. 264-66). The ALJ couldn't have been more clear. Plaintiff's daily activities don't show he can work, but in the ALJ's common sense evaluation, they do tend to show his allegations about his symptoms are exaggerated.

And, of course, there is the medical record, which includes, as already explained, a number of positive or normal entries and a number of negative entries. Again, it was up to the ALJ to sift through this evidence, weigh it, and reach a conclusion. She did so, and found that the plaintiff's allegations of crippling symptoms did not line up with the many normal or benign exam findings. Discrepancies between medical findings and a claimant's allegations may suggest symptom exaggeration. *Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018); *Stewart v. Berryhill*, 731 F. App'x 509, 510 (7th Cir. 2018); *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010). Indeed, the consultative psychiatrist specifically opined that plaintiff was exaggerating his symptoms.

That leaves the plaintiff's complaint regarding the ALJ's treatment of his obesity and

migraines.  These two points are left undeveloped, unsupported by caselaw, and are rank speculation.

The plaintiff's brief says that it is hard to believe that someone who is 5'6" and weighs 250 would

be able to work.  [Dkt. # 13, at 12].   But, as the ALJ said, plaintiff has no musculoskeletal

impairments, and the combination of such impairments with obesity is generally the concern.

Moreover, plaintiff does not allege, even in his brief that he has any limitations stemming from his

obesity that would affect his ability to work.   And there appears to be no mention of obesity as a

factor limiting plaintiff's ability to work anywhere in the record; plaintiff certainly doesn't direct to

court to any.   *See, e.g., Shumaker v. Colvin*, 632 F. App'x 861, 867–68 (7th Cir. 2015)("Moreover,

[plaintiff] does not identify any evidence in the record that suggests greater limitations from her

obesity than those identified by the ALJ, and neither does she explain how her obesity exacerbated

her underlying impairments");*Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)(ALJ's failure

to even mention  obesity not enough to warrant remand where plaintiff "does not explain how his

obesity would have affected the ALJ's five-step analysis.").

Similarly, while plaintiff says he has migraines, he does no more than speculate that

migraines would affect his ability to focus, as well as his ability to maintain proper attendance and

remain on task. [Dkt. #13, at 12].   Again, as with obesity, there are no more than a couple of

mentions of migraines anywhere in the record, and nothing to indicate they have any effect on the

plaintiff's capacity for work.   Indeed, the doctor who plaintiff incorrectly says diagnosed them, as

"intractable" – she didn't, she was merely recounting plaintiff's complaint (R. 432) – in fact

suggested they might not be migraines at all, but tension headaches based on plaintiff's description.

(R. 433).  Like obesity, an allegation of migraines doesn't equal disability. *Elder v. Berryhill*, 774

Fed.Appx. 980 (7th Cir. 2019); *West v. Berryhill*, 733 Fed.Appx. 843 (7th Cir. 2018). Migraines might

be disabling, or they might not. *See, e.g., Hammerslough v. Berryhill*, 758 Fed.Appx. 534 (7th Cir. 2019); *Dorota K. M. v. Berryill*, 2018 WL 5298532 (N.D. Ill. 2018); *Tucker v. Astrue*, 2009 WL 3060223 (S.D. Ind. 2009). A plaintiff must do more to alert an ALJ to how an impairment affects his ability to work, and certainly must do far more than the plaintiff has done here to show a reviewing court that migraines or any condition necessarily renders an applicant unable to work. Otherwise, the mere mention of an ailment in a medical record, even devoid of any explanation of its severity or its effects, would constitute entitlement to benefits or, at least, to a remand. That is not how a properly functioning Social Security system works or was designed to function. It bears repeating that diagnosis is not the same as disability. *Schmidt*, 395 F.3d at 746; *Estok*, 152 F.3d at 640. *See also Carradine*, 360 F.3d at 754.

## CONCLUSION

For the foregoing reasons, the ALJ's decision is affirmed, and the plaintiff's motion [Dkt.#12] for summary judgment is denied.

ENTERED: _____

**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 12/16/19